**UNITED STATES v. POLONIO et al.**

**No. C–15922.**

District Court, D. Oregon.

Nov. 1, 1941.

Carl C. Donaugh, U. S. Atty., and J. Mason Dillard, Asst. U. S. Atty., both of Portland, Or., for plaintiff.

Edwin D. Hicks, of Portland, Or., and Homer L. Loomis, of New York City, for defendants.

JAMES ALGER FEE, District Judge.

This is a criminal action brought against Giovanni Polonio, who was the master of the Italian ship "Leme," and others who were of her officers and crew, on account of damage alleged to have been done.

Indictment is in two counts, the first of which charges the defendants jointly with the specific crime of tampering with the motive power and instrumentalities of navigation of the Motorship "Leme," with intent to injure or endanger the safety of said vessel. This count was brought under Section 502, Title 18 U.S.C.A. The second count is a charge of conspiracy against all of the defendants to violate the same statute. The case was tried before a jury. The defendants presented a motion for a directed verdict, which the Court granted as to six of the defendants as to each count of the indictment and as to several other defendants on the conspiracy count. A motion in arrest of judgment is now on file, together with a motion for a new trial. These motions will be dealt with

together. The construction placed upon the statutes by the Court is challenged by these motions.

The text of Title II, Sec. 3, of the Act of Congress of June 15, 1917 (40 Stat. 217, 220),[1] which now appears as Section 193, Title 50 U.S.C.A., as amended March 28, 1940, by 54 Stat. 79, deals with "any private vessel, foreign or domestic," and the text of Title III, Sec. 1, of the same Act of Congress (40 Stat. 217, 221),[2] appearing as Section 502, Title 18 U.S. C.A., deals with vessels "of foreign registry" and vessels "of American registry entitled to engage in commerce with foreign nations" and "any vessel of the United States," as defined in the previous section as "a vessel belonging in whole or in part to the United States, or any citizen thereof, or any corporation created by or under the laws of the United States, or of any State, Territory, or District thereof."

Section 502, Title 18 U.S.C.A., denounces "whoever * * * shall tamper with the motive power," while Section 193, Title 50, makes certain acts unlawful "for the owner or master or any other person in charge or command * * * or for any member of the crew or other person." Section 502, Title 18 U.S.C.A. deals with and discusses the acts as crimes specifically. Section 193, Title 50 U.S.C.A., while creating certain criminal responsibilities for the acts, is designed as a forfeiture statute to which the criminal provisions are entirely incidental. Section 502 deals with injury to the motive power and instrumentalities of a vessel and is apparently the only law on that subject.

It will be noted as a matter of history that the whole act was adopted when the international situation was entirely comparable to that which existed at the time these acts were charged to have been committed. In view of this and the evident purpose of the statute, the argument that "tampering," used in Section 502, meant only interfering with the property

---

[1] Title II. Vessels in ports of the United States.

Sec. 3. "It shall be unlawful for the owner or master or any other person in charge or command of any private vessel, foreign or domestic, or for any member of the crew or other person, within the territorial waters of the United States, willfully to cause or permit the the destruction or injury of such vessel or knowingly to permit said vessel to be used as a place of resort for any person conspiring with another or preparing to commit any offense against the United States, or in violation of the treaties of the United States or of the obligations of the United States under the law of nations, or to defraud the United States, or knowingly to permit such vessels to be used in violation of the rights and obligations of the United States under the law of nations; and in case such vessels shall be so used, with the knowledge of the owner or master or other person in charge or command thereof, the vessel, together with her tackle, apparel, furniture, and equipment, shall be subject to seizure and forfeiture to the United States in the same manner as merchandise is forfeited for violation of the customs revenue laws; and whoever violates this section shall be fined not more than $10,000, or imprisoned not more than two years, or both." By the amendment of March 28, 1940, 54 Stat. 79, the penalty clause was changed to read as follows:

" * * * whoever violates this section shall be punished by imprisonment for not more than ten years and shall, in the discretion of the court, be fined not more than $10,000."

[2] Title III. Injuring vessels engaged in foreign commerce.

Sec. 1. "Whoever shall set fire to any vessel of foreign registry, or any vessel of American registry entitled to engage in commerce with foreign nations, or to any vessel of the United States as defined in section three hundred and ten of the Act of March fourth, nineteen hundred and nine, entitled 'An Act to codify, revise, and amend the penal laws of the United States,' or to the cargo of the same, or shall tamper with the motive power or instrumentalities of navigation of such vessel, or shall place bombs or explosives in or upon such vessel, or shall do any other act to or upon such vessel while within the jurisdiction of the United States, or, if such vessel is of American registry, while she is on the high sea, with intent to injure or endanger the safety of the vessel or of her cargo, or of persons on board, whether the injury or danger is so intended to take place within the jurisdiction of the United States, or after the vessel shall have departed therefrom; or whoever shall attempt or conspire to do any such acts with such intent, shall be fined not more than $10,000 or imprisoned not more than twenty years, or both."

of another but not with one's own property cannot be maintained. The definitions of the word itself connote secrecy and scheming or plotting. The definition in Webster's New International Dictionary (Merriam), 2nd Edition, which squarely fits the language of the indictment and which was used by the Court in its instructions, is:

"3. To meddle so as to alter a thing; esp., to make corrupting or perverting changes, as to *tamper* with a document or a text; to interfere improperly."

The evidence in this case showed that the vessel, at the time of the acts, was in the custody of the United States Marshal in civil proceedings instituted in this Court, and that the acts which were done, were done secretly and surreptitiously and without witnesses except the persons who were engaged therein. Therefore, if the notion could be entertained that the consent of the owner or possessor prevented the interference with the engines of the ship from being characterized as a tampering therewith, under these special circumstances, the definition given above would squarely apply.

■ An argument is made from the fact that the title headings seem to draw a distinction between vessels engaged in foreign commerce and vessels in port, but the text of Section 502 plainly provides that whoever shall tamper with the motive power of a vessel of "foreign registry * * * within the jurisdiction of the United States" shall be punished. The "Leme" clearly was a vessel of foreign registry and within the jurisdiction of the United States, and unquestionably was so engaged in foreign commerce. The mere fact that the "Leme" was tied up in port and therefore could have been seized under Section 193, if it were proven in an appropriate proceeding that her owner or master had done the acts denounced in that section, should not operate as a defense to a criminal proceeding against anyone who did the acts denounced in Section 502.

Comment has been made upon the fact that the maximum sentence under Section 193 is only for two years, whereas the sentence under Section 502 may be as much as twenty. It is argued from this[3] that Section 502 must have been intended to cover cases where the safety of the vessel itself was involved, whereas Section 193 related to minor matters. But it will be noted that the specific intent required in Section 502 is "to injure or endanger the safety of the vessel," while in Section 193 one of the acts denounced is "wilfully to cause or permit the destruction or injury of such vessel." The real distinction, then, lies in the fact that Section 193 is primarily a forfeiture statute, whereas Section 502 is essentially a criminal statute. It is obvious that the vessel could not be seized unless the owner was involved in the act, either directly or through the master. The reason for the lower criminal penalty in Section 193, the forfeiture statute, is that most of the acts made punishable are permissive only, whereas Section 502 denounces only definite affirmative acts.

■ It is well known that Congress may define the same act as punishable under two different statutes, with varying incidents. It appears clear that the intention in this case was to so define these separate crimes. The circumstances under which the acts were passed indicate that this was true. The argument to escape the consequences is highly technical in nature, based on grammatical distinctions and matters of punctuation and seems entirely to disregard the serious situations which unquestionably the act was passed to cover.

A consideration of the evidence of the case shows there was widespread damage to the main engines, the electrical equipment, the pumps, the fire fighting apparatus, the mechanism for lowering and raising the anchor, the radio and other equipment. The destruction outlined in itself indicated the participation of many persons and a common purpose animating

---

3 It should not be overlooked, however, that the discrepancy upon which this argument is based was diminished by the Congress when the maximum penalty under Section 193 was increased from two to ten years in March, 1940, a year prior to the acts alleged in this indictment.

all. Thus, the specific acts were done which the statute denounces.

The Court required the jury to find specific intent "to injure or endanger the safety of the motorship 'Leme.'" This is the language of the statute. The sentence in which this appears in the act is not a grammatical model. The view has been advanced that the clause "the safety of" is the object of the verb "to injure" and the verb "endanger." But the answer is that "to injure * * * the safety of the vessel" does not make sense, whereas "to injure * * * the vessel" and "or endanger the safety of the vessel" convey meaning. The text can, of course, be read thus.

Intent is a mental operation which characterizes an act. It has always been a question of fact. Intent is incapable of direct proof, except by the declaration or testimony of the party who entertains the mental state. But a specific intent may be denied categorically or an entirely different intent claimed and still the required intent may be found by the triers of fact in the surrounding circumstances.

A ship or vessel is not the hull alone, but consists of the engines and other integral portions thereof.[4] Therefore, according to the interpretation of the Court, an intent to injure the vessel would be satisfied by finding of an intent to injure the integral parts thereof, such as the main engines. However, the Court did not so limit the jury by instruction.

With this state of facts the jury might well have believed that the intent was to destroy the vessel, if that end could be accomplished. The jury could well have believed that there would have been no hesitation about destroying the vessel, if thereby the "Leme" could have been kept from falling into the hands of the English government. The circumstances that the fire fighting apparatus was tampered with and the pumps for pumping out the hold had been rendered inoperative could well indicate a design to accomplish the destruction of the vessel, if in some other manner she had sprung a leak or had fortuitously caught on fire.

It is not without its weight that the defendants in this case went only far enough so that it could be claimed that they were simply trying to render the vessel useless. Apparently the whole theory of defense had been worked out by whatever superior ordered the acts to be done, with the idea that a technical defense might be imposed and thereby the defendants be permitted to escape the penalties which the act provided. While, therefore, the Court was of the opinion that the specific intent required by the act was only an intent to injure the vessel and would have been accomplished by an intent to injure any of her essential portions, such as the engines, the pumps or the instrumentalities of navigation, the evidence was sufficient to permit the case to go to the jury, even if the intent required were an intent to endanger the safety of the vessel.

The factors which might have given basis to the existence of specific intent to injure or endanger the safety of the vessel are these: It is common knowledge that the axis powers have sunk many merchant vessels to prevent them from falling into the hands of their enemies. There had been agitation in the United States concerning the taking over of these ships.

This question is purely one for the triers of fact. The Court, unless convinced that a manifest injustice had been done, should not set aside a finding of specific intent. There are so many elements which enter into the finding which do not necessarily appear on the record. The attitude of the defendants in the courtroom, the incidents of the trial, the native common sense and knowledge of affairs by the jury may all enter into the finding.

The Italian government was at war with other nations. The evidence shows that, as a result of the declaration of war, this ship was ordered into Portland harbor. The reason was obvious. This action was

---

[4] Benedict on Admiralty, 6th Ed., Vol. 1, Sec. 59; The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937; The Manila Prize Cases, 188 U.S. 254, 23 S.Ct. 415, 47 L.Ed. 463; The Frolic, D.C., 148 F. 921; The Hope, D.C., 191 F. 243; The Gertrude, Fed.Cas.No.5,370, 2 Ware 181, 3 Story 68.

taken to prevent her from falling into the hands of the enemy. The ship was under guard by the United States Marshal as a result of a libel in a civil proceeding. She could not have escaped to sea. All this constituted circumstantial evidence, apart from the admissions, as to intent of the persons who caused the damages.

The other serious point raised by the motion for new trial is based upon the fact that none of the defendants testified in the case. The government was, therefore, required to prove its case as to each of the defendants by competent evidence and beyond a reasonable doubt. The government, after proof of the general situation and of damage done to the motive power and instrumentalities of navigation, introduced proof of admissions made with due and appropriate safeguards to the officers of the Federal Bureau of Investigation. It is contended that there was not sufficient proof of the specific intent required by the statute to establish the case without use of these admissions and there is a suggestion that the identity of the defendant committing the acts could not be established by the admission without independent proof of his participation. The Court instructed the jury at various times during the course of the case that the admissions made by one defendant were not binding upon another defendant and carefully supervised the admission in evidence of such statements, so that the names of other defendants were not related in stating the admissions of a particular defendant.

Upon the question of the use of the admissions, the Court instructed the jury:

"In considering the question of the innocence or guilt of the defendants under each of the two counts of the indictment, you may not consider or give credence to the admissions of the various defendants put in evidence by the government unless you find in the other evidence of the case proof, apart from said admissions, of the commission of the acts complained of in a particular count of the indictment, and proof, also apart from said admissions, of the intent with which the acts were done. Unless such proof, apart from and independent of such admissions, is found in the other evidence in the case, you would have to acquit the particular defendant on the particular charge."

In the case of Forte v. United States, 68 App.D.C. 111, 94 F.2d 236, 127 A.L.R. 1120, the question of corroboration of a confession arose. There, also, a mental operation was involved. The question of whether the defendant knew the car had been stolen was in issue. The Court shows that there was evidence in the case from which it might have been inferred as a fact that defendant had this knowledge. The Court apparently holds that, because these circumstances did not conclusively and directly establish the knowledge, and might have been explained upon a different basis, the verdict of conviction must be set aside. This reasoning is erroneous.[5] Even without the admission or confession, the circumstances should have been committed to the jury as a question of fact with appropriate instructions as to the use of circumstantial evidence. There is no method of proving knowledge except by a consideration of the surrounding circumstances and the demeanor of the defendant. The mere fact that another inference might be drawn does not destroy the inference of knowledge that the car was stolen. If an act is denounced by the law as criminal if characterized by a specific mental state, a sufficient case is made to go to the jury if it be shown that a person has done the act, then the mental state is a question for the jury without further proof.

Motion for new trial is denied.

Motion in arrest of judgment is quashed.

---

[5] Although this case was before the Supreme Court in Forte v. United States, 302 U.S. 220, 58 S.Ct. 180, 82 L.Ed. 209, it was there only for the consideration of certified questions on procedural matters bearing no relation to this point.